**LOCAL 7-210, OIL, CHEMICAL AND ATOMIC WORKERS INTERNATION- AL UNION, AFL-CIO, Plaintiff,**

v.

**UNION TANK CAR COMPANY, Defendant.**

**No. 71 C 846.**

United States District Court,
N. D. Illinois, E. D.

Sept. 20, 1971.

Kleiman, Cornfield & Feldman, Chicago, Ill., for plaintiff.

Joel H. Kaplan, and Harvey M. Adelstein, Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

This is an action by Local 7-210, Oil, Chemical and Atomic Workers International Union, AFL-CIO (OCAW) against Union Tank Car Company (Company) to enforce the damages portion of a labor arbitration decision. Jurisdiction is based on Section 301 of the Labor Management Relations Act, 29 U. S.C. § 185. Both parties moved the Court to dismiss and/or for summary judgment. A brief reiteration of the facts as found by the arbiter is necessary for a full understanding of the case.

In addition to the Company's many other phases of business, it is also engaged in the manufacture of railway tank cars and in repair and maintenance of completed tank cars in East Chicago and Whiting, Indiana. The tank car shells were built in the Company's Graver Plant in East Chicago and then shipped to its Whiting Plant for the final finishing work. OCAW has represented the employees at the Whiting Plant since 1959, and the International Brotherhood of Boilermakers, Iron Ship Builders,

Blacksmiths, Forgers, and Helpers, Local 374 (Boilermakers) has represented the employees at Graver Plant in East Chicago since 1945. Both East Chicago and Whiting are in the Calumet area of Indiana.

In 1966, the Company purchased a vacated plant about three miles away from its Whiting Plant and across the street from its Graver Plant in East Chicago. The plant, since remodelled and known as Plant No. 1, was designed and built as an integrated tank car manufacturing plant with the object of using it as an additional manufacturing facility in the Calumet area. In late 1966, the Company received a special order for foam insulated tank cars, which, because of time schedules, it decided to have built and finished in Plant No. 1. Upon learning that Boilermakers were doing the finishing work, OCAW protested and filed a grievance pursuant to its collective bargaining agreement charging the Company with a violation of Article II, Section 1, of its agreement. Said agreement states:

## ARTICLE II

### Recognition; Union Security; Checkoff

Section 1. This Agreement shall apply only to the operations of the Company at its Whiting, Indiana plant; provided, however, if such plant or operation is moved to another location in the Calumet area, this Agreement shall also apply to such other location.

In the grievance discussions which followed, the Company declared that the protested job was only a temporary one and that the employees assigned on it would return to the Graver Plant when it was finished.

On March 31, 1968, the Company and the Boilermakers negotiated a successor agreement to replace the one which expired on that date. In said agreement, the Boilermakers recognition as bargaining agent was extended to Plant No. 1. The arbiter was of the opinion that when the Boilermakers recognition was extended to Plant No. 1 "there was no thought in anyone's mind that the Whiting finishing operation would be relocated there. * * * It is much more realistic to suppose that both the Company and the Boilermakers negotiators understood the extension of recognition to cover only the fabricating work that was 'presently' being performed at the Graver Plant and not the finishing operation which was being performed at Whiting."

Said agreement states in part:

## ARTICLE I

### Recognition and Relationship

Section 1. Recognition and Bargaining Unit. The Company recognizes the Brotherhood as the sole collective bargaining agent for wages, hours and working conditions representing the following appropriate unit, namely, all production and maintenance employees at the Company's plant at 151st and Railroad Ave., East Chicago, Indiana [Plant No. 1's location] * * *.

The new Company-Boilermakers agreement effective April 1, 1971, adds some weight to the arbiter's opinion. It states in part:

## ARTICLE I

### Recognition and Relationship

Section 1. Recognition and Bargaining Unit. The Company recognizes the Brotherhood as the sole collective bargaining agent for wages, hours and working conditions representing the following appropriate unit, namely, all production and maintenance employees at the Company's plant at 151st and Railroad Avenue, East Chicago, Indiana, including such employees working in the finishing operations * * *.

On February 23, 1969, the Company and OCAW renewed their agreement. During the course of the negotiations OCAW was presented with a copy of the 1968 Boilermakers agreement. OCAW

persistently maintained during those negotiations that irrespective of whether or not another union represented the fabricating operation employees at the new plant, if all or a portion of the finishing operations were moved from Whiting to another plant in the Calumet area, the Company would be obligated under Article II, Section 1, to apply its agreement to those operations. The Company continuously represented that it had every intention of continuing the Whiting finishing operations. Allegedly, it also agreed that neither union's rights would be affected by operations at the new plant, and that both unions would be consulted before action was taken to give rights to either one.

A few months later, the Company informed OCAW that it was terminating the Whiting finishing operation and establishing it at Plant No. 1. Numerous Company-OCAW discussions followed and finally, failing to resolve their differences, OCAW filed a grievance pursuant to their collective bargaining agreement, charging the Company with a violation of the 1969 OCAW agreement and requesting that the agreement be applied in its entirety to Plant No. 1.

It is to be noted that the finishing operation at Plant No. 1 is (1) plainly identifiable; (2) performed exactly as it was at Whiting; (3) performed largely in areas separate from the fabricating operation; and (4) performed under separate supervision.

After findings and conclusions of fact, the arbiter, selected by both parties, found that the Company had violated Article II, Section 1, of the OCAW agreement by failing to have said agreement follow and apply to the finishing operation employees when they were moved from the Whiting Plant to Plant No. 1.

In his first opinion and award, rendered on August 4, 1970, the arbiter remanded to the parties for negotiation and settlement the question of the nature and extent of relief to be granted,

retaining jurisdiction to finally decide the remedy question if the parties were unable to do so within a reasonable period of time. They failed to do so and, on November 6, 1970, he rendered the second and final following award:

"(a) Contingent upon a determination by the National Labor Relations Board that it would not violate the provisions of the NLRA, the Company is directed to apply the existing OCAW agreement to the finishing operations performed in Plant No. 1.

"(b) The Company is directed to reimburse and make whole all OCAW-represented employees for all lost wages and benefits, including health and welfare and retirement benefits, caused by the violation of Article II, Section I as heretofore determined."

During the interim of the initial and final awards while the Company and OCAW were negotiating in compliance therewith, the Boilermakers filed charges with the National Labor Relations Board (NLRB) alleging violations by the Company of §§ 8(a) (1), (2) and (5) and demanding that the Company cease negotiating with OCAW since the disputed employees were deemed covered by the Boilermakers contract. While these Boilermakers charges were pending before the Regional Director of the Thirteenth Region of the NLRB, OCAW, in mid-October, filed two petitions: One requesting a representation election among the employees working in the Plant No. 1 finishing operations and the other requesting a unit clarification of its Whiting bargaining unit to include the Plant No. 1 finishing operations. Both petitions later were withdrawn— only to be refiled in late February and again withdrawn.

On November 4, 1970, the Thirteenth Regional Director, responding to the Boilermakers' charges, issued a complaint alleging, *inter alia,* "that the Boilermakers were the collective bargaining representative of the employees at Plant No. 1, including those doing finishing work, and that by bargaining with

OCAW in accordance with the Platt arbitration award,. (the arbiter's first award) over such employees doing finishing work, the Company violated §§ 8(a) (1), (2) and (5) of the National Labor Relations Act." (NLRA).

The arbiter was aware of these events when he rendered his final award two days later, and he also was aware that the Company planned to file a unit clarification petition.

On April 28, 1971, the Thirteenth Region of the NLRB responding to the Company's unit clarification petition requesting that the Boilermakers bargaining unit at Plant No. 1 be clarified to specifically include the finishing operation employees, rendered a decision holding that the employees, including those previously employed at Whiting and now employed at Plant No. 1, were properly within the Boilermakers unit and that the "appropriate unit of Plant No. 1 is a plant-wide production and maintenance unit, including the finishing operations and that the employees in this unit are presently, and have been since June 1969, represented by the Boilermakers as their exclusive bargaining representative."

Prior to the Company's unit clarification petition, a hearing was held on March 17, 1971, under the AFL–CIO Internal Disputes Plan, before arbiter D. Cole. That hearing was held pursuant to charges, later withdrawn by OCAW, against the Boilermakers for violation of the AFL–CIO "no raiding" agreement and counter-charges of the Boilermakers against OCAW based on similar allegations. On March 24, 1971, arbiter Cole ruled that OCAW had violated this agreement by its filing of representation petitions for the employees doing finishing work at Plant No. 1 represented by the Boilermakers.

The record shows that the NLRB complaint, the Cole ruling, and the April 28, 1971, NLRB ruling all discussed extensively OCAW's factual situation.

OCAW does not now assert a claim for representative status at Plant No. 1, nor does it assert that it has any bargaining right, or the right to negotiate a new agreement with the Company. Neither does it seek to enforce that portion of the arbiter's final award requiring the application of the OCAW contract at Plant No. 1. It merely seeks to enforce part (b) of the award requiring the remedy of reimbursement for lost wages and benefits for former OCAW represented employees.

At the outset, the Company contends that the award is not separable and that both Sections (a) and (b) of the award were contingent upon a later NLRB decision. The Company argues that since the award required it to apply the OCAW contract only if legally permissible, and to pay damages for the period during which it legally could apply said contract to Plant No. 1 but did not do so, it is not liable for damages, having acted in accord with the NLRB ruling that the proper exclusive bargaining representative with whom it must negotiate is the Boilermakers. The thrust of the Company's position is that since it could not be compelled to apply the OCAW contract to Plant No. 1, because to do so would be illegal and violative of the NLRB ruling, it cannot now be compelled to pay damages for refusing to commit an unfair practice act.

The Court agrees with OCAW that the arbiter, aware of both the surrounding events and of a possible future NLRB decision regarding the representative status of OCAW, deliberately worded his final opinion and award so as to make it into two distinct parts, having only part (a) contingent upon a subsequent NLRB decision. The arbiter was of the opinion that the legal straitjacket which the Company later might find itself in was a result of its voluntary breach of contract by extending Boilermaker recognition to Plant No. 1 before it was completed and before any substantial operations were performed there. As OCAW contended before him "[h]ad the Company acted in good faith it could readily have granted recognition (for each Union) at Plant No. 1

dependent on the nature of the operation to be performed at that Plant."

Irrespective of this Court's leanings, the decision of the United States Supreme Court in Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964); The Seventh Circuit in Smith Steel Workers v. A. O. Smith Corp., 420 F.2d 1 (7th Cir. 1969); and the Eastern District of Louisiana in Dock Loaders & Unloaders, Local 854 v. W. L. Richeson & Sons, Inc., 280 F.Supp. 402 (E.D. La. 1968) appear conclusive upon the question presented.

In *Carey*, the Supreme Court was faced with an action by one union to compel Westinghouse to arbitrate a grievance alleging that employees represented by a second union were performing work belonging to the first union. When Westinghouse refused to arbitrate, the complaining union sought a court order compelling arbitration. The New York courts refused to grant the order. The Supreme Court reversed them. In discussing the effect of a conflict between an arbiter's award and a later NLRB decision, the Supreme Court stated in *Carey*, 375 U.S. at 272, 84 S. Ct. at 409, that:

> "Should the Board disagree with the arbiter, by ruling, for example that the employees involved in the controversy are members of one bargaining unit or another, the Board's ruling would, of course, take precedence; and if the employer's action had been in accord with that ruling, it would not be liable for damages under § 301."

As noted in *Dock Loaders & Unloaders, Local 854, supra*, at 405, "[t]he quoted language, of course, is dicta for the specific issue before the Court in *Carey* was only whether arbitration could be compelled. However, in the absence of authority to the contrary, or of persuasive reasons for reaching the opposite result, the language of the Supreme Court commands respect."

In *Smith*, two unions claimed representation rights over certain disputed job classifications. The NLRB responding to a unit clarification petition filed by the company involved awarded representation rights to one of the unions. Despite the NLRB decision, the losing union demanded arbitration, which the company refused. The union then went into Federal District Court to compel arbitration. The District Court dismissed the complaint and was affirmed by the Seventh Circuit. In discussing the supremacy of the NLRB and the negation of a conflicting arbiter's award, the Seventh Circuit stated that "[a]rbitration provides an alternative means of resolving disputes over the appropriate representational unit, but it does not control the Board in subsequent proceedings. Carey v. Westinghouse Electric Corp., 375 U.S. 261, 268–272, 84 S. Ct. 401, 11 L.Ed.2d 320. * * * The court could compel neither arbitration nor enforce any arbiter's award in conflict with the Board's order. National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 365, 60 S.Ct. 569, 84 L.Ed. 799."

In *Dock Loaders*, the Dock Loaders filed a grievance with a grievance committee alleging that the employer had reached its collective bargaining agreement by assigning certain disputed jobs to members of the Teamsters Union. The Dock Loaders won the arbitration award and sought to enforce it in the Federal District Court. During the interim, the NLRB, responding to an unfair labor practice charge filed by the Teamsters, awarded the disputed work to them. After considering the aforementioned dicta in *Carey*, the court was of the opinion that the NLRB ruling awarding the disputed work to Teamster-represented employees barred the Dock Loaders' award of damages accruing prior to the NLRB decision despite the grievance committee award requiring such damages. Dock Loaders & Unloaders, Local 854 v. W. L. Richeson & Sons, Inc., 280 F.Supp. 402 (E.D. La. 1968).

In view of these decisions, it would appear that the law thus estab-

lished is that where there is a conflict between an arbiter's award and a later NLRB ruling, the arbiter's findings must give way before the superiority of the NLRB decision. If the employer has acted in accord with the NLRB decision, it is not liable for damages.

Accordingly, it hereby is adjudged, ordered and decreed that plaintiff's motion for summary judgment is denied and defendant's motion to dismiss the complaint and for summary judgment is granted.