**LOCAL 7-210, OIL, CHEMICAL AND ATOMIC WORKERS, INTERNATIONAL UNION, AFL-CIO, Plaintiff-Appellant,**

v.

**UNION TANK CAR COMPANY, Defendant-Appellee.**

**No. 71-1798.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 3, 1972.

Decided March 7, 1973.

Rehearing En Banc Denied Apr. 27, 1973.

Arnold E. Charnin, Chicago, Ill., for plaintiff-appellant.

Harvey M. Adelstein, Joel H. Kaplan, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and PELL, Circuit Judge.

HASTINGS, Senior Circuit Judge.

On April 6, 1971, pursuant to § 301 of the Labor Management Relations Act, as amended, Title 29, U.S.C.A. § 185, plaintiff-appellant, Local 7–210, Oil, Chemical and Atomic Workers International Union, AFL–CIO (OCAW), filed an action in the federal district court against defendant-appellee, Union Tank Car Company (Company). It sought thereby to enforce compliance with the provisions and award of a decision by Labor Arbitrator Harry Platt.

This action was the culmination of the tortuous course of a labor dispute between the parties. The administrative procedures included an initial and final decision by Arbitrator Platt, a succession of unfair labor practice charges, representation petitions and unit clarification petitions before the National Labor Relations Board and a decision by Impartial Umpire David Cole under the AFL–CIO Internal Disputes Plan.

For many years the Company had been engaged in the manufacture of railway tank cars for lease and sale and in the repair and maintenance of completed tank cars at plants located throughout the United States, including facilities involved here located at East Chicago and Whiting, Indiana.

The facility in East Chicago was located on Tod Avenue. Until the latter part of 1969, it was primarily used in the manufacture (fabrication) of tank car shells. Aside from some tank car finishing functions there, the usual procedure was to ship the tank car shells to its Whiting plant for finishing. In 1961, the Whiting facility had been engaged principally in the repair and maintenance of damaged tank cars.

In 1966, the Company acquired a vacant facility, known as Plant No. 1, in East Chicago, across the street from its Tod Avenue plant. It then began remodeling Plant No. 1 with the intention of building, for the first time, an integrated manufacturing facility where new tank cars could be completely manufactured in one place. At that time the Company claimed it had no intention of curtailing the finishing operations at Whiting but did plan to engage in finishing operations at Plant No. 1 when it was ready. In late 1969, because of financial reasons, such as market projections, general economic forecasts and orders, the Company decided, sometime after Plant No. 1 was completed, that it would not be feasible to maintain Whiting as a finishing operation. Accordingly, in early 1970, the major portion of the finishing operation was curtailed there and Whiting went back to being a repair and maintenance facility. By late 1970, finishing work at Whiting ceased.

In the meantime, fabrication work commenced at Plant No. 1 in 1968 and was timed with the phase-out of the Tod Avenue plant. It was accomplished by the transfer of employees from Tod Avenue. By August 1970, peak employment at Plant No. 1 was reached. This included 200 employees working in the finishing operation, some of whom had been transferred from Whiting.

Beginning in 1945, when the Tod Avenue plant in East Chicago was owned and operated by Graver Tank and Manufacturing Company, and continuing from 1957, when it was acquired by the Company, the production and maintenance employees in East Chicago were and still are represented by Local 374, International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO (Boilermakers). Likewise, at all times relevant here, the employees performing finishing and repair and maintenance work at Whiting were represented by OCAW. Boilermakers and OCAW were parties to separate collective bargaining agreements with the Company at all material times. All employees at Plant No. 1 were covered by the Boilermakers' contract. After notifying OCAW of its intention to curtail the Whiting operations, the Company and OCAW were unable to resolve their differences, OCAW taking the position that the Company was required to apply the OCAW agreement to the finishing operations at Plant No. 1. The above mentioned labor administrative procedures resulted.

The ruling of Arbitrator Platt sought to be enforced in the instant § 301 complaint was:

"(a) Contingent upon a determination by the National Labor Relations Board that it would not violate the provisions of the NLRA, the Company is directed to apply the existing OCAW Agreement to the finishing operations performed in Plant No. 1.

"(b) The Company is directed to reimburse and make whole all OCAW-represented employees for all lost wages and benefits, including health and welfare and retirement benefits, caused by the violation of Article II, Section 1 as heretofore determined."

Defendant Company filed a motion to dismiss the complaint and for summary judgment. Plaintiff OCAW filed a cross-motion for summary judgment. Subsequently, OCAW advised the district court, as it does now on this appeal, that it no longer seeks to enforce that part of the Platt award requiring the application of the OCAW contract at Plant No. 1 as set out in part (a), *supra*. OCAW no longer asserts any claim for representative status at Plant No. 1 or any bargaining right or the right to negotiate a new agreement with the Company. It merely seeks to enforce part (b) of the award requiring the reimbursement and "make whole" remedy for former OCAW-represented employees.

OCAW's action in not further asserting any right to apply the existing OCAW agreement to the finishing operations performed in Plant No. 1 is but a compelled recognition of the determination by the National Labor Relations Board on April 28, 1971, that the employees, including those previously employed at Whiting and now employed at Plant No. 1, were properly within the Boilermakers' unit and that the "appropriate unit of Plant No. 1 is a plantwide production and maintenance unit, including the finishing operations and that the employees in this unit are presently, and have been since June 1969, represented by the Boilermakers as their exclusive bargaining representative." In short, in making its ruling on April 28, 1971, the NLRB had the entire situation before it [1] and pre-empted the field and chose to determine OCAW's rights under the National Labor Relations Act.

In substance, OCAW contends that the two provisions in the Platt award are separable and that the contingency upon an NLRB determination in part (a) is limited to that section and

1. The record shows that the impartial umpire, David Cole, under the AFL–CIO Internal Disputes Plan, had held a hearing and ruled that OCAW had violated its agreement with AFL–CIO by its attempts to interfere with the Boilermakers' established collective bargaining status "as to employees doing finishing or car completion work at Plant No. 1."

does not cover the remedial directions in part (b). The Company makes the opposite contention. Viewed as a common law breach of contract question, a persuasive argument could be made for OCAW's position. However, we are in agreement with the district court that this case must be decided within the context of the Labor Act. If so, the action taken by the NLRB cannot be restricted to the representation matter, but it must be said to embrace all other matters, such as working conditions, wages and the like which are implicit in the rights accorded the certified representative of the employees at the plant covered by the collective bargaining agreement there in force.

The Company did not apply the OCAW contract to Plant No. 1 because it could not legally do so, for such would have been an unfair labor practice. Having acted in accord with the NLRB decision, how may the Company be liable for damages for refusing to violate the law? There was no breach of contract because OCAW's contract was never in force at Plant No. 1.

■ On August 4, 1970, Arbitrator Platt specifically ruled: "The Company violated Article II, Section 1 of the Agreement [with OCAW] by failing to apply the OCAW Agreement to the finishing operation when it was moved from the Whiting Plant to Plant No. 1." This, of course, is in direct conflict with the later NLRB ruling, and OCAW has now abandoned any claims under part (a) of the Platt award. The remedial direction in part (b) of the Platt award is "to reimburse and make whole all OCAW-represented employees" for losses "caused by the violation of Article II, Section 1 as heretofore determined." This, too, is in direct conflict with the later NLRB ruling and cannot be separated from the contingency in part (a). Since there were never any OCAW-represented employees at Plant No. 1, because all employees there were represented by Boilermakers, it necessarily follows that the Company could not be made to respond in damages for the breach of a contract never in force at Plant No. 1.

In defining the limits and scope of arbitration in the field of national labor policy in Carey v. Westinghouse Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), Mr. Justice Douglas, writing for the majority, said: "Should the Board [NLRB] disagree with the arbiter, by ruling, for example, that the employees involved in a controversy are members of one bargaining unit or another, the Board's ruling would, of course, take precedence; and if the employer's action had been in accord with that ruling, it would not be liable for damages under § 301." Id. at 272, 84 S.Ct. at 409. The Court further noted that "[t]he superior authority of the Board may be invoked at any time," but continued to recognize "the therapy of arbitration." Id. See NLRB v. Plasterers Local 79, 404 U.S. 116, 136–137, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971). Cf. U. S. Bulk Carriers, Inc. v. Arguelles, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971).

A district court put some flesh on the bare bones of the Supreme Court's dicta in Carey in Dock Loaders Local 854 v. W. L. Richeson & Sons, E.D.La., 280 F. Supp. 402, 404–405 (1968). There, two unions, Teamsters and Dock Loaders, were locked in a dispute as to which should perform certain unloading work. Dock Loaders, following a grievance, won an arbitration award granting it the work and sought to enforce it in the federal district court. Following threat of a strike by Teamsters, the NLRB, responding to an unfair labor practice charge by the employer, awarded the work to Teamsters. Dock Loaders then filed a § 301 suit against the employer to enforce its arbitration award. The employer moved to dismiss and for summary judgment. The court held [Id. at 404] that there "would seem to be no question that, as between a grievance committee award of disputed jobs to certain employees and a conflicting NLRB allocation of the same jobs to different employees, the latter takes 'preced-

ence,' " citing New Orleans Typographical Union No. 17 v. NLRB, 5 Cir., 368 F.2d 755, 767 (1966). In *Dock Loaders*, the court held that the dicta in *Carey* command respect, and in view of such language it ruled that the Labor Board's decision awarding the disputed work to Teamsters barred the recovery of damages in the § 301 case under the arbitrator's award. *Cf.* Ironworkers Local 395 v. Lake County Council, Bhd. of Carpenters, N.D.Ind., 347 F.Supp. 1377, 1380 (1972).

Finally, in Smith Steel Workers v. A. O. Smith Corp., 7 Cir., 420 F.2d 1 (1969), we were concerned with a case in which two unions claimed representation rights over certain disputed job classifications. The employer sought a unit clarification by the Labor Board to determine the dispute. The Labor Board awarded the representation rights to one union. Nevertheless, the losing union demanded arbitration, which the employer refused. The losing union then sought to have the federal district court compel arbitration. The employer filed unfair labor practice charges against the losing union, alleging the union's actions in continuing to seek representation of its workers violated the Labor Act. The Labor Board found a violation of § 8(b)(3) of the Act on the ground that it had held the losing union to be inappropriate in its unit clarification decision. It entered an appropriate cease and desist order.

The district court dismissed the complaint, holding (1) that it lacked jurisdiction to set aside the Board's action. and (2) that under § 301(a) of the Act it could not compel the employer to arbitrate the representation question which had already been determined by the Labor Board in its prior unit clarification order. In its memorandum opinion, reported at 285 F.Supp. 1011 (1968), relying on Retail Clerks International Association v. Montgomery Ward & Co., 7 Cir., 316 F.2d 754, 757 (1963), the district court said: "Plaintiff now seeks to

enforce a contract which would require defendant Company to take action directly contrary to a Board determination. Neither the policy of the Labor Management Relations Act nor prior court decisions support plaintiff's position." 285 F.Supp. at 1016.

We affirmed the district court's order, and Circuit Judge Cummings, writing for our court, said:

"The district court was also correct in refusing to compel arbitration of the unit representation issue after its determination by the Board. Arbitration provides an alternative means of resolving disputes over the appropriate representational unit, but it does not control the Board in subsequent proceedings. Carey v. Westinghouse Electric Corp., 375 U.S. 261, 268–272, 84 S.Ct. 401, 11 L.Ed.2d 320. In this case no arbiter's award existed to which the Board could defer. All the parties involved in the dispute joined in petitioning the Board for clarification of the certificates and the arbitration hearing was accordingly postponed. The Board was not bound to delay its consideration of the issue under these circumstances. The Board's 1967 determination of the appropriate units fully disposed of the question. It defined the lawful limits of coverage of the contract which the Union sought to have enforced under Section 301(a) of the Labor Management Relations Act (29 U.S.C. § 185(a)). As in Retail Clerks International Ass'n v. Montgomery Ward & Co., 316 F.2d 754, 757 (7th Cir. 1963), the Board's order deprived the Union of any right to recognition as the representative of the laboratory technicians and experimental workers. See also McGuire v. Humble Oil & Refining Company, 355 F.2d 352, 357–358 (2d Cir. 1966), certiorari denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004. The court could compel neither arbitration nor enforce any arbiter's award in conflict with the Board's order. National Lic-

orice Co. v. National Labor Relations Board, 309 U.S. 350, 365, 60 S.Ct. 569, 84 L.Ed. 799." 420 F.2d at 7.

Further, after recognizing that the duties imposed on employers and unions by the Labor Act are complementary and must be construed in harmony with one another, we found that the same is true of the bargaining responsibilities created by the Act. The employer was required to bargain only with the proper representative of the appropriate bargaining units, even though the employer had previously bound himself by contract to bargain with an inappropriate representative. *Id.* at 8, citing appropriate cases.

Quoting further from *Smith, id.* at 9: "Moreover, the unit clarification procedure is designed to present an alternative to an unfair labor practice charge as a means for obtaining an official determination of the correct bargaining units." And, *id.* at 10: "In addition, the Board's unit clarification order precluded any recourse by the Union to arbitration or other grievance procedure. As a result of that order, no contractual issues existed which could be arbitrated or settled by bargaining."

■■ A complete reading of *Smith*, and its recognition of *Carey* and related cases, makes clear to us the relevance of the supremacy doctrine, and that once the Board has acted, either before or after the arbitrator's award, the Board's order overrides the arbitrator's decision. *Smith* further makes it clear that contractual rights cannot exist separately and apart from the union's right to represent the unit. *Id.* at 12–13.

We have carefully reviewed the various contentions made by OCAW and find them unpersuasive in light of *Carey, Dock Loaders* and *Smith, supra,* and National Licorice Co. v. NLRB, 309 U.S. 350, 365, 60 S.Ct. 569, 84 L.Ed. 799 (1940). We are in accord with the well reasoned memorandum opinion of the

district court, 337 F.Supp. 83 (1971), and the final conclusion reached by Judge Parsons, when he said:

"In view of these decisions, it would appear that the law thus established is that where there is a conflict between an arbiter's award and a later NLRB ruling, the arbiter's findings must give way before the superiority of the NLRB decision. If the employer has acted in accord with the NLRB decision, it is not liable for damages." *Id.* at 87–88.

For the foregoing reasons, we affirm the action of the district court in denying the monetary remedial relief sought by the plaintiff. The judgment denying plaintiff OCAW's motion for summary judgment and granting defendant Company's motion to dismiss the complaint and for summary judgment is affirmed.

Affirmed.

SWYGERT, Chief Judge.

I respectfully dissent. In support of affirmance, the majority asserts (1) that the facts of the case display no breach of contract by the company and (2) that the damage award of arbitrator Platt is in conflict with a unit clarification ruling by the Labor Board, thereby unenforceable on the authority of Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964), Smith Steel Workers v. A. O. Smith Corp., 420 F.2d 1 (7th Cir., 1969), and Dock Loaders and Unloaders Local Union No. 854 v. W. L. Richeson & Sons, Inc., 280 F.Supp. 402 (E.D.La., 1968).[1] With deference to the view held by my Brothers, I believe their reliance on *Carey* and its progeny is misplaced; if the arbitrator erred in finding a violation of contract, his award must fall for that reason and not because the award conflicts with a Board ruling. Moreover, if the arbitrator did not err, I cannot agree that his award is in conflict with a decision of the Labor Board.

1. *See also* Iron Workers, Local 395 v. Carpenters, 347 F.Supp. 1377 (N.D.Ind.,

1972), a case very close on its facts to *Dock Loaders.*

## I

Article II, Section I of the 1969 OCAW agreement reads:

This agreement shall apply only to the operations of the Company at its Whiting, Indiana plant; provided, however, if such plant or operation is moved to another location in the Calumet area, this agreement shall also apply to such other location.

The history of bargaining between the company and OCAW from 1959 reveals that this removal provision and analogous predecessors were insisted upon by OCAW to assuage its concern that the company would relocate operations performed by OCAW members at the Whiting plant despite representations by the company that it had every intention of continuing the Whiting operations. As it turned out, the fears of the Union proved justified; only a few months subsequent to consummation of the 1969 agreement, the company informed OCAW that it was terminating the finishing operation at Whiting and reestablishing it at East Chicago, where the company had already extended recognition to the Boilermakers.

Negotiations ensued. OCAW took the position that the company was bound by the removal provision to apply the 1969 agreement to finishing operations at East Chicago. The company's response was to dispute the Union's interpretation of the contract and to argue that it could not lawfully recognize OCAW or apply the OCAW contract at East Chicago inasmuch as it had already extended representation recognition to the Boilermakers. The company persisted in the latter position throughout the course of litigation on the matter, and, on March 10, 1971, invoked the Board's representation processes by filing a unit clarification petition requesting that the Boilermakers' bargaining unit at East Chicago be clarified to specifically include the employees working in the finishing operation at that location.

Thus it is fair to say that the company, both at the time of and subsequent to its decision to relocate the Whiting finishing operation, had no intention of applying the OCAW contract at East Chicago, and, indeed, was convinced that to do so would violate its legal obligation to the Boilermakers as the exclusive bargaining representative for East Chicago employees.

## II

The majority's holding that no contract violation occurred is summed up by the following paragraph of Judge Hastings' opinion:

The Company did not apply the OCAW contract to Plant No. 1 because it could not legally do so, for such would have been an unfair labor practice. Having acted in accord with the NLRB decision, how may the Company be liable for damages for refusing to violate the law? There was no breach of contract because OCAW's contract was never in force at Plant No. 1.

From this I discern two separate positions.[2] The first is that the company was excused from compliance with the removal clause of the OCAW contract because of impossibility of performance; the second is that the company could not have breached the contract because it "was never in force at Plant No. 1 [East Chicago]."

While the quoted excerpt is a correct statement of fact, it fails as a premise to support its conclusion. That the contract sued upon was in force at Whiting

---

2. A clarifying interpretation is needed for the statement that the company "acted in accord with the NLRB decision." There was no such decision in existence when the company chose to move the finishing operation from Whiting. The company relied solely on the NLRA in refusing to apply the OCAW contract at East Chicago. Furthermore, neither the NLRA nor the eventual unit clarification ruling by the Board ordered the company to move its finishing operation; each dictated only that operations at East Chicago were solely within the jurisdiction of the Boilermakers.

is beyond dispute; the issue before us is whether the contract was violated at that location, not at East Chicago.

In resolving this issue a cardinal principle of contract law must be kept in mind. Professor Williston states it as follows:

> It is a principle of fundamental justice that if a promiser is himself the cause of the failure of performance either of the obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure. 5 Williston, Contracts § 677 (3d ed. 1961).

Professor Corbin is of like mind:

> Whatever be the meaning given to the term impossibility, whether it be objective or subjective, and even though it be used to include varying degrees of difficulty and expense, the supervening situation that is so described does not excuse a promisor from his contractual duty if he himself wilfully brought it about, or if he could have foreseen and avoided it by the exercise of reasonable diligence and efficiency. In such a case, the promised performance was not impossible in any sense, either at the time the contract was made or for some time thereafter. 6 Corbin, Contracts § 1329 (1962).

To put it another way, and with specific reference to the agreement at issue, the requirement of the removal clause that the OCAW agreement be applied at any new site of operation embodies a prohibitory mandate that the company undertake no move which would foreclose application of the contract. And the facts leave no room for dispute that the company found it impossible to obey the removal clause because it chose to move the Whiting operation to a plant where exclusive representation had already been granted to another union. The real issue, then, is whether the company exercised "a reasonable degree of effort and diligence" in attempting to comply with the removal clause. 6 Corbin, Contracts § 1329 (1962).

The arbitrator found that the move from Whiting was motivated solely by economic considerations. The company admits this: "In late 1969 . . . serious financial considerations such as market projections, general economic forecasts and orders, caused the Company to reconsider [its] plans to maintain dual facilities." Def. Brief at 5. Generally speaking, however, changed economic circumstances do not validate a defense of impossibility. This is not a case like United Auto Workers v. Hamilton Beach Mfg. Co., 40 Wis.2d 270, 162 N.W.2d 16 (1968), In re Curtiss-Wright Corp. and Office Employees' International Union, Local 279, 43 Lab.Arb. 5 (1964), or In re Safeway Stores, Inc. and Retail Clerks International Union, Local No. 648, 42 Lab.Arb. 353 (1964), where the union contract contained no express provision dealing with plant removal, and legitimate business motives were found to justify a move of operations. See also Shoe Workers v. Brooks Shoe Mfg. Co., 183 F.Supp. 568 (E.D. Pa., 1960). This, instead, is a case where plant removal was barred except upon the condition that the contract be applied at any new site of operation. This provision was not complied with. Absent extreme economic hardship, cf. In re Curtiss-Wright Corp. and Office Employees' International Union, Local 279, 43 Lab.Arb. 5 (1964)—which the company certainly has failed to establish—no excuse lies for its breach of the removal clause. See In re Jack Meilman and Amalgamated Clothing Workers of America, 34 Lab.Arb. 771 (1960), In re Centra Leather Goods Corp. and Pocketbook Workers Union of New York, 25 Lab.Arb. 805 (1956).[3]

---

3. The company would avoid this analysis by noting that arbitrator Platt "*did not hold that the Company violated the OCAW agreement by moving the work from Whiting* or that it was required to build a new plant separate and apart from Plant No. 1." Def. Brief at 33 (emphasis supplied). This may be true if the arbitrator's opinion is read narrowly, but it is hardly a compelling rea-

### III

Smith Steel Workers v. A. O. Smith Corp., 420 F.2d 1 (7th Cir., 1969), holds that a unit clarification decision by the Labor Board provides an absolute defense to employer liability for violation of contract provisions respecting work assignments when work is assigned by the employer in conformity with the Board's ruling. Dock Loaders and Unloaders Local Union No. 854 v. W. L. Richeson & Sons, Inc., 280 F.Supp. 402 (E.D.La., 1968), adds the corollary that employer violations of work assignment contract provisions are wiped out if his actions prove to be in conformity with national labor policy as interpreted by the Labor Board in a subsequent unit clarification ruling.

I do not agree with the majority that these cases are dispositive of the instant appeal. The company did not violate its contract with OCAW by refusing broadly to apply the work assignment provisions of the contract. It entirely avoided the OCAW contract by moving its finishing operation to a location where the NLRA—and, later, an NLRB decision—foreclosed adherence thereto, in direct violation of the contract's removal clause. The distinction is important. Arbitral decisions on the issue of work assignment and Labor Board unit clarification decisions go to the heart of an identical question: Who shall perform disputed work? An arbitrator's decision that a company has violated its contract by moving the site of a given operation is an entirely different matter. In short, the decision by arbitrator Platt is wholly compatible with the unit clarification by the Board.

Had the relocation of operations at issue been required by the Act or by a Board decision, I would agree that *Smith* and *Dock Loaders* fully dispose of OCAW's sought damage award. This case, however, is one step removed; free from statutory or administrative compulsion and motivated solely by thoughts of financial gain, the company placed itself in a position where it could not apply the OCAW contract. While the end result of the company's decision to remove has a surface similarity to the situations in *Smith* and *Dock Loaders*, the fact remains that the dilemma in which the company assertedly found itself prior to the NLRB decision was entirely of its own making and the product of its willful violation of the collective bargaining contract. In *Smith* and *Dock Loaders* the employer had no way of avoiding the eventual disputes with competing unions. If he favored one union, the other protested breach of contract and violation of the NLRA. This case does not present that situation. Had the company chosen to comply with the removal clause by staying at Whiting or moving to another location where compliance was practicable, it is difficult to imagine that the Boilermakers or the Board would have been heard to complain.

Although I agree that not all remedies may be open to an arbitrator when a violation of contract is found, the fact that one remedy may be unavailable hardly justifies a denial of liability. This, in essence, is what the company is arguing here;[4] since, it asserts, an injunctive remedy requiring application of the OCAW contract at East Chicago is

---

son to reverse the arbitrator when his ultimate determination of a contract violation is unimpeachable. It is also significant that the company does not argue that OCAW failed to raise the above contentions before the arbitrator.

4. Assume that arbitrator Platt required the company to reestablish finishing operations at Whiting, rather than awarding the contingent injunctive relief that he did. See In re Centra Leather Goods Corp. and Pocketbook Workers Union of

New York, 25 Lab.Arb. 805 (1956). In that event I doubt that the company would argue that *Smith* and *Dock Loaders* require vacation of the damage award, since company compliance with the arbitral mandate would eliminate any possibility that company action would conflict with the Board clarification of the East Chicago unit. This case differs only in that the injunctive relief sought by OCAW did raise such a conflict. But it bears repeating that the injunctive remedy

precluded by the Board unit clarification, damages on the same contract would be inconsistent. This is not correct. The company violated the OCAW contract in a manner which—unlike a work assignment violation—is not protected by the Board clarification decision. That the Board decision precludes injunctive relief for that violation is no reason to withhold all relief.

I would therefore reverse the decision of the trial court and remand the cause for a determination of damages to OCAW.

is not now at issue; as the arbitrator himself recognized, that remedy was necessarily "contingent upon a determination by the National Labor Relations Board that it would not violate the provisions of the NLRA."